IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

ROBERTO HERNANDEZ,

                Plaintiff,                Case No. 3:14 CV 250

  -vs-

                                         MEMORANDUM OPINION

CITY OF FINDLAY, et al.,

                Defendant.

KATZ, J.

Defendants Greg Horne, Morgan Greeno, Chad McMonigal, John Schmidt, and the City of Findlay, Ohio have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(a). (Doc. No. 41). Plaintiff Roberto Hernandez has filed a response (Doc. No. 61), and the Defendants have filed a reply. (Doc. No. 63).

Mr. Hernandez alleged that: 1) Officers Greeno, McMonigal, and Schmidt violated his Fourth and Fourteenth Amendment rights under 42 U.S.C. § 1983 by using excessive force; 2) Officers Greeno, McMonigal, and Schmidt were grossly negligent when they placed handcuffs on him which were too tight; 3) Officers Greeno, McMonigal, and Schmidt are liable for criminal conduct under Ohio Rev. Code § 2307.60; and 4) Police Chief Horne and the City of Findlay violated his Fourth and Fourteenth Amendment rights under § 1983 by failing to properly train and supervise Officers Greeno, McMonigal, and Schmidt.

I. Jurisdiction and Venue

The Court finds that it has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343. Venue is also properly before the Court. *See* 28 U.S.C. § 1391; N.D. Ohio R. 3.8.

II. Facts

The following facts are undisputed. Mr. Hernandez was stopped by Officer Greeno at 6:36 p.m. on East Main Cross Street in Findlay, Ohio on February 20, 2012. (Hernandez Dep. p. 45; Greeno Dep. p. 29 and its Exhibit 5, pp. 1–2). When Officer Greeno stopped Mr. Hernandez, a headlight on Mr. Hernandez's vehicle was not illuminated. Mr. Hernandez concedes that Officer Greeno made a lawful traffic stop (Hernandez Dep. p. 45; Greeno Dep. p. 30), and acknowledges that Officer Greeno correctly suspected that he had been using marijuana. (Doc. No. 20 ¶ 12; Hernandez Dep. pp. 46–47). The stop occurred approximately four or five blocks from the Findlay police station. (Hernandez Dep. pp. 70–71 and its Exhibit B; Greeno Dep. pp. 30, 69–70 and its Exhibit A).

Officer Greeno had detected the odor of marijuana when she initially spoke to Mr. Hernandez. When Officer Greeno called the police dispatcher to report the stop, she learned that Mr. Hernandez had prior drug convictions. Officer Greeno requested assistance. (Greeno Dep. pp. 31–32). Officers McMonigal and Schmidt responded to the request.

Mr. Hernandez admitted that he had smoked marijuana earlier that day and that the smoking pipe that was found in his vehicle had been used by himself and his companions that day. (Hernandez Dep. pp. 46–48). Mr. Hernandez was aware that the marijuana and pipe were in his car when he was stopped. (Hernandez Dep. pp. 50–51). Although Officer Greeno did not suggest that she wished to impound the car, Mr. Hernandez requested that she take the car. He explained this by stating: "Well, when you make a mistake, the first think [sic] you do is you try to cover it up." (Hernandez Dep. p. 52).

Because Officers Greeno and McMonigal believed Officer Greeno might have agitated Mr. Hernandez, they "switched up," and Officer McMonigal took over Mr. Hernandez's questioning.

2

(Greeno Dep. p. 35; McMonigal Dep. pp. 8–9). Officer Schmidt stood by, near the rear of Mr. Hernandez's vehicle. (Greeno Dep. pp. 35–36; Schmidt Dep. pp. 9, 12).

Although Mr. Hernandez denied that he was moving around or tugging at his clothes in his vehicle, the officers testified to observing these actions. Mr. Hernandez contends he was reaching for something despite being instructed to place his hands on the steering wheel of his car. (Hernandez Dep. pp. 57–59; Greeno Dep. p. 33; McMonigal Dep. pp. 8, 10). After speaking to Mr. Hernandez, Officer McMonigal had him leave the vehicle. Mr. Hernandez told Officer McMonigal that he was in possession of a taser that looked like a cell phone and a can of pepper spray. (Hernandez Dep. pp. 57–60; McMonigal Dep. p. 10). Although Mr. Hernandez had numerous encounters with the police in the past, contrary to the instructions he was given, Mr. Hernandez continuously reached for these weapons as he stood near his vehicle and the officers. Officer Greeno heard Officer McMonigal escalate his voice several times. (Greeno Dep. p. 37). Officer McMonigal escalated his verbal commands after telling Mr. Hernandez repeatedly to keep his hands on the vehicle. (McMonigal Dep. pp. 10–11).

Mr. Hernandez admits he was *repeatedly* noncompliant with the officer's instructions regarding his attempts to reach for the weapons. Mr. Hernandez stated that he carried weapons because he worked at a heroin addiction clinic and he was aware that people with drug problems caused trouble. (Hernandez Dep. pp. 58–61). Officer Greeno knew that Mr. Hernandez had a prior drug history with her department. (Greeno Dep. p. 32). Both she and Officer McMonigal correctly suspected that Mr. Hernandez had drugs in his possession. (Greeno Dep. p. 31; McMonigal Dep. p. 9).

3

After Officer Greeno searched Mr. Hernandez's car and found the marijuana and pipe, she placed Mr. Hernandez under arrest and handcuffed him. (Hernandez Dep. pp. 63–64; Greeno Dep. pp. 40–41). Mr. Hernandez asked the officers not to handcuff him behind his back because he had a shoulder problem. (Hernandez Dep. p. 65; Greeno Dep. p. 41). However, Findlay police department policies normally require that prisoners being transported are to be handcuffed behind their backs. (Ring Dep. pp. 33–35 and its Exhibit A).

Officer Greeno responded to Mr. Hernandez's request by handcuffing him with two interlocking sets of handcuffs. While Officer Greeno handcuffed Mr. Hernandez, Officer McMonigal stood to her left for her safety and scene safety. (Greeno Dep. p. 44). Officer Greeno had safety concerns at the scene due to the drug involvement, Mr. Hernandez's resistance to Officer McMonigal's verbal commands, and his actions while inside the vehicle. (Greeno Dep. pp. 54–55, 57).

At the time of his arrest, Mr. Hernandez was fifty years old, was approximately 5 feet 10 inches tall, and weighed about 195 pounds. (Hernandez Dep. pp. 5, 36–37). He had weapons on his person, drugs in his possession, and a known history of drug arrests.

Mr. Hernandez complained about his shoulder and the tightness of the handcuffs. (Hernandez Dep. p. 69; Greeno Dep. p. 42). In his Amended Complaint, Mr. Hernandez alleged that Officer McMonigal handcuffed him and denied that two sets of handcuffs were used. However, he could not see who handcuffed him, nor could he see how many pairs of handcuffs were used. (Hernandez Dep. p. 68). Each officer testified that Officer Greeno used two sets of interlocking handcuffs in response to Mr. Hernandez's concerns about his shoulder. (Greeno Dep. pp. 41–42; Schmidt Dep. pp. 12, 20, 22–23; McMonigal Dep. pp. 14–15, 21–24 and its Exhibit 2).

4

After arresting and handcuffing Mr. Hernandez, Officer Greeno placed Mr. Hernandez in her squad car and transported him to the nearby police station. (McMonigal Dep. p. 16). Mr. Hernandez acknowledges that the police station was near the arrest scene and estimated the drive took perhaps 5 or 7 minutes. However, he identified a diagram showing the location of the stop and the location of the jail, which demonstrates that the distance was very short, only a few blocks. (Hernandez Dep. p. 71 and its Exhibit B). Officer Greeno testified that the transport took two to three minutes. (Greeno Dep. p. 70 and its Exhibit A). Officer McMonigal testified the drive would take two minutes. (McMonigal Dep. pp. 37–38).

Mr. Hernandez testified that he was placed in a holding cell at the police station while handcuffed, estimating that he was there for approximately fifteen minutes. However, Mr. Hernandez guessed at the time, having not referred to a watch or clock. (Hernandez Dep. p. 73).

Officer Greeno testified that she placed Mr. Hernandez in a holding cell, still in handcuffs, while she obtained the necessary paperwork. (Greeno Dep. pp. 45, 48). She estimated it took her about one minute to obtain the needed information. Officer Greeno also testified that Mr. Hernandez was in the holding cell less than two minutes. (Greeno Dep. p. 70). As soon as she retrieved the necessary paperwork, Officer Greeno stated she took Mr. Hernandez out of the holding cell and removed the handcuffs. (Greeno Dep. p. 50). Officer Greeno explained her actions and the dispatcher entries establish Mr. Hernandez was in handcuffs for a very short period of time. (Greeno Dep. pp. 59–60, 73–79 and its Exhibit 5, p. D00006; Affidavit of Dispatcher Molly Royster ¶¶ 3–7 and its Exhibits A and B).

Mr. Hernandez admitted to a physician on February 4, 2013, that he had been handcuffed tightly for twenty minutes on February 20, 2012. (Kern Affidavit ¶ 8).

5

Contrary to his allegations, the evidence shows that Mr. Hernandez was handcuffed for a very short period of time. Officer Schmidt, who had taken custody of Mr. Hernandez's taser, pepper spray, marijuana, and drug paraphernalia was the last officer to leave the arrest scene. He went directly to the police station. (Schmidt Dep. pp. 11–12, 14). By the time he arrived, Mr. Hernandez had already been released from the handcuffs. (Schmidt Dep. p. 21). Officer McMonigal also immediately drove to the station. (McMonigal Dep. p. 16). Officer McMonigal described Mr. Hernandez as agitated and upset while at the station. (McMonigal Dep. p. 16).

After his booking was completed, Mr. Hernandez was given copies of the charges against him, along with his personal items. Mr. Hernandez then walked back to his car. (Hernandez Dep. pp. 82–83).

Officers Greeno, McMonigal, and Schmidt all observed Mr. Hernandez's wrists shortly after he was released from the handcuffs. The officers did not believe the marks on the wrists looked any different from the wrists of any other individual who had been handcuffed. (Greeno Dep. p. 51; Schmidt Dep. p. 21; McMonigal Dep. p. 18).

On February 21, 2012, Mr. Hernandez went to the Findlay police station to complain about the events of the previous day. He spoke to then-Sergeant Robert Ring. (Ring Dep. pp. 6, 9–10). Lt. Ring observed Mr. Hernandez's wrists. There were no marks on his wrists or other indications that he had been improperly handcuffed. (Ring Dep. pp. 15–16). Lt. Ring's informal report of his meeting with Mr. Hernandez states that Mr. Hernandez told Lt. Ring he had been handcuffed using two sets of handcuffs to help accommodate his shoulder condition. (Ring Dep. pp. 9–10 and Exhibit 1, p. 1).

Mr. Hernandez did not seek medical treatment in connection with the handcuffing. He recalled that he had been getting regular cortisone shots for shoulder pain, but testified:

A. So your question was after, after this [February 20, 2012 arrest] did I go and get any cortisone shots or get treated by any doctors for pain in my shoulder. That was the question?

Q. Yes

A. Then no.

(Hernandez Dep. p. 80).

Mr. Hernandez alleged that he suffered severe "injuries to both his wrists and hands which only surgery could correct." (Doc. No. 20 ¶17). No medical records, however, exist for treatment of wrist problems anywhere near the time of the arrest. Mr. Hernandez has a long and complicated medical history involving accidents and chronic illnesses. His medical records, produced in discovery, exceed 1,550 pages. (Kern Affidavit ¶¶ 2–3).

Mr. Hernandez attested that he has seen so many doctors that he has trouble recalling whom he has seen and when. (Hernandez Dep. p. 15). Although he has seen numerous medical providers and was treated for numerous conditions and injuries over the years, Mr. Hernandez's medical records establish he received no medical treatments between August 23, 2011, and November 12, 2012. The November 2012 records disclose that Mr. Hernandez was seeking pre-operative clearance for a vocal cord biopsy. There is no notation in these records of wrist pain. In fact, Mr. Hernandez specifically denied joint pain and swelling. (Kern Affidavit ¶ 6).

Mr. Hernandez has a long history of diabetes mellitus and diabetic neuropathy. Mr. Hernandez testified he became diabetic when he was twenty-eight years old. (Hernandez Dep. p. 22). His medical records disclose a history of noncompliance with his diabetic treatment

requirements. (Kern Affidavit ¶¶ 9–10). The records include statements from a neurologist noting that Mr. Hernandez's neuropathy was most likely secondary to his diabetes. (Kern Affidavit ¶ 13).

A February 2009 record indicates that Mr. Hernandez was not compliant with his treatment regiment. In June 2014, his physician noted that Mr. Hernandez had not taken his diabetic medication for one month. (Kern Affidavit ¶ 10).

On February 4, 2013, Mr. Hernandez saw vascular surgeon Dr. Jihad Abbas. Mr. Hernandez stated he had been handcuffed tightly for twenty minutes on February 20, 2012. Dr. Abbas's records noted a recent EMG report indicated that Mr. Hernandez had carpal tunnel syndrome. (Kern Affidavit ¶ 8). Dr. Nabil Ebraheim subsequently performed carpal tunnel surgery on both wrists. The first procedure was performed on March 19, 2013, while the second was performed on April 5, 2013. Despite the surgeries, Mr. Hernandez reported that he was still experiencing pain and numbness in his fingers. (Kern Affidavit ¶¶ 11–12).

Mr. Hernandez has had longstanding peripheral neuropathy caused by his diabetic condition. (Kern Affidavit ¶ 10). Dr. Noor Pirzada, a neurologist, examined Mr. Hernandez in 2013 and 2014. Dr. Pirzada refused to link the hand numbness and tingling to the February 2012 handcuffing. Specifically, Dr. Pirzada noted that the possible underlying nerve disease and neuropathy was most likely secondary to Mr. Hernandez's diabetes. (Kern Affidavit ¶¶ 9, 13). Dr. Ebraheim stated in June 2014 that Mr. Hernandez had persistent peripheral neuropathy from diabetes. (Kern Affidavit ¶ 15).

Although the exact amount of time Mr. Hernandez was in handcuffs is in dispute, police department records confirm that Officer Greeno reported stopping Mr. Hernandez at 6:36 p.m.

8

Officer McMonigal arrived four minutes later, while Officer Schmidt arrived six minutes later. Mr. Hernandez was in custody (handcuffed) at 6:59 p.m., was en route to the jail at 7:00 p.m., and the officers were available for another dispatch at 7:07 p.m. (Greeno Dep. pp. 59–60, 73–79; Royster Affidavit ¶¶ 3–6 and its Exhibits A and B). Thus, the entire encounter took thirty-one minutes, while Mr. Hernandez would have been handcuffed approximately eight minutes.

Each of the officers involved in the incident looked at Mr. Hernandez's wrists at the police station and each attested that Mr. Hernandez's wrists looked no different from those of other individuals who also had been handcuffed. The following day, Lt. Ring saw no marks on Mr. Hernandez's wrists. (Ring Dep. p. 16). Mr. Hernandez did not seek medical treatment for his alleged condition which he claims is related to his handcuffing for almost a year.

### III. Summary Judgment Standard

Summary judgment is proper where "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting a genuine issue of material fact must support the argument either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A court views the facts in the record and reasonable inferences which can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). A court does not weigh the evidence or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The party requesting summary judgment bears an initial burden of demonstrating that no genuine issue of material fact exists, which the party must discharge by producing evidence to demonstrate the absence of a genuine issue of material fact or "by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25 (1986) (internal quotation marks omitted). If the moving party satisfies this burden, the nonmoving party "may not rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren,* 578 F.3d 351, 374 (6th Cir. 2009) (citing Rule 56 and *Matsushita,* 475 U.S. at 586). The party opposing the summary judgment motion must present sufficient probative evidence supporting its claim that disputes over material facts remain; evidence which is "merely colorable" or "not significantly probative" is insufficient. *Anderson,* 477 U.S. at 248–52.

IV. Discussion

In Count I of his amended complaint, Mr. Hernandez alleged that Officers Greeno, McMonigal, and Schmidt violated his Fourth and Fourteenth Amendment rights by using excessive force. He alleged the force used against him "was unnecessary, unreasonable and excessive and done with callous indifference." (Doc. No. 20 ¶ 30). As a result, he suffered physical, mental, and emotional injuries.

*A. Fourteenth Amendment*

In order to state a Fourteenth Amendment claim, Mr. Hernandez must have been a pretrial detainee at the time of his injuries. *Aldini v. Johnson*, 609 F.3d 858, 864–67 (6th Cir. 2010). In explaining how a court must examine a claim under the Fourth Amendment versus the Fourteenth Amendment, the Sixth Circuit has stated:

> A plaintiff has a substantially higher hurdle to overcome to make a showing of excessive force under the Fourteenth Amendment as opposed to under the Fourth Amendment. *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001). Under the Fourth Amendment, we apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants. *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004); *see also Graham*, 490 U.S. at 396–97, 109 S. Ct. 1865. We balance "the nature and quality of the intrusion on [a plaintiff's] Fourth Amendment interests against the countervailing governmental interests at stake." *Ciminillo v. Streicher*, 434 F.3d 461, 466–67 (6th Cir. 2006). In doing so, three factors guide our analysis: " '[ (1) ] the severity of the crime at issue, [ (2 ] whether the suspect poses an immediate threat to the safety of the officers or others, and [ (3) ] whether he is actively resisting arrest or attempting to evade arrest by flight.' " *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (quoting *Graham*, 490 U.S. at 396, 109 S. Ct. 1865). These factors are assessed from the perspective of a reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances without the advantage of 20/20 hindsight. *Graham*, 490 U.S. at 396–97, 109 S. Ct. 1865.
>
> In contrast, with a Fourteenth Amendment claim, we consider whether the defendant's conduct "shocks the conscience" so as to amount to an arbitrary exercise of governmental power. *Darrah*, 255 F.3d at 306 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46, 851–53, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)). This standard differs depending on the factual circumstances. *See id*. Where defendants are "afforded a reasonable opportunity to deliberate . . . their actions will be deemed conscience-shocking if they were taken with 'deliberate indifference' towards the plaintiff's federally protected rights." *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (citing *Lewis*, 523 U.S. at 851–52, 118 S. Ct. 1708). If, however, the incident was a "rapidly evolving, fluid, and dangerous predicament," the plaintiff must show that the defendant acted "'maliciously and sadistically for the very purpose of causing harm' rather than 'in a good faith effort to maintain or restore discipline.'" *Id*. (quoting *Lewis*, 523 U.S. at 853, 118 S. Ct. 1708).
>
> Notwithstanding the Due Process Clause's broader applicability, we remain cognizant of the fact that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n. 7, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997) (citing *Graham*, 490 U.S. at 394, 109 S. Ct. 1865).

*Burgess v. Fischer*, 735 F.3d 462, 472–73 (6th Cir. 2013).

*Burgess* noted that until *Aldini*, the Sixth Circuit had never addressed how far the Fourth Amendment protection extended beyond the individual's transfer of custody from the arresting officer to jail authorities. *Id*. at 474. The court noted that the "Fourth Amendment extends at least through the completion of the booking procedure, which is typically handled by jailers." *Id*. (internal quotation marks and citations omitted). In finally determining where the Fourth Amendment ended and the Fourteenth Amendment began, the Sixth Circuit held that "the dividing line between the Fourth and Fourteenth Amendment zones of protection [is at] the probable cause hearing for warrantless arrests." *Id*.; *Aldini*, 609 F.3d at 867. As *Aldini* and *Burgess* explicitly provide that the Fourteenth Amendment does not apply to Mr. Hernandez because he was not a pretrial detainee at the time of the alleged injury, summary judgment is granted to the Defendants on Mr. Hernandez's Fourteenth Amendment claim.

B. *Fourth Amendment*

*Aldini* and *Burgess* require that the proper analysis of Mr. Hernandez's federal claim must be under the Fourth Amendment. The Fourth Amendment has an objective reasonableness test. The Court looks at the reasonableness of the Defendants' actions in light of the totality of the circumstances that were confronting the Defendants, and not to the underlying intent or motivation of the Defendants. *Burgess*, 735 F.3d at 472; *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004); *see also Graham v. Connor*, 490 U.S. 386, 396–97 (1989). The Court balances "the nature and quality of the intrusion on [a plaintiff's] Fourth Amendment interests against the countervailing governmental interests at stake." *Ciminillo v. Streicher*, 434 F.3d 461, 466–67 (6th Cir. 2006). The reasonableness of the Defendants' actions are assessed from the perspective of a

reasonable officer on the scene, rather than with the advantage of 20/20 hindsight. *Graham*, 490 U.S. at 396–97.

The Court finds that Mr. Hernandez has not shown that the actions of Officers Greeno, McMonigal, and Schmidt violated his Fourth Amendment rights. In examining the circumstances facing these officers at the time of Mr. Hernandez's arrest, their actions were reasonable. *See Dunigan*, 390 F.3d at 493; *see also Graham*, 490 U.S. at 396–97.

The facts establish that at the time of his arrest, Mr. Hernandez was known to the arresting officers as having prior drug convictions. Drugs and drug paraphernalia were found in Mr. Hernandez's vehicle at the time of his arrest. Mr. Hernandez admittedly possessed two weapons at the time of his arrest — a taser and pepper spray. Mr. Hernandez acknowledges that he was very irritated during the incident. Further, Mr. Hernandez was repeatedly non-compliant with the officers' instructions. Given these circumstances, and in balancing "the nature and quality of the intrusion on [Mr. Hernandez's] Fourth Amendment interests against the countervailing governmental interests" of safety to the community and arresting officers, *Ciminillo*, 434 F.3d at 466–67, the balance tips in favor of the officers' safety. *See Martin v. City of Broadview*, 712 F.3d 951, 958 (6th Cir. 2013).

Although the Court finds that the officers acted properly in determining the need to handcuff Mr. Hernandez, the reasonableness of their actions is further emphasized by the fact that Mr. Hernandez was handcuffed with two sets of handcuffs. After expressing his concerns about his shoulder condition, the officers showed consideration for Mr. Hernandez by allowing him additional shoulder comfort in using two handcuffs. This action demonstrates an excellent balance by the officers of considering Mr. Hernandez's shoulder comfort with their own safety.

Mr. Hernandez complains about the tightness of the handcuffs and the length of time he was handcuffed. There is no dispute that the entire incident, from when Mr. Hernandez was pulled over, until the officers were available for another call, was thirty-one minutes. Further, Mr. Hernandez admits he was placed in handcuffs around the time Officer Greeno advised the police dispatch that he was in custody. (Doc. No. 61, pp. 9–10). Police dispatch records establish that this call was made at 6:59 p.m. With the officers being available for another call at 7:07 p.m., this would mean that Mr. Hernandez was in handcuffs approximately eight minutes.

The evidence establishes that Officer Greeno checked the tightness of the handcuffs by placing her fifth finger into both handcuffs after they were secured. She further checked to see if the handcuffs were double locked so they would not get tighter.

Significantly, there is no evidence that Mr. Hernandez suffered any injury as a result of the use of the handcuffs. The record establishes that the arresting officers saw normal indentation marks on Mr. Hernandez's wrists after his release from custody. The following day, Lt. Ring observed no marks on Mr. Hernandez's writs. Further, Mr. Hernandez did not seek medical treatment for his alleged injuries until nearly one year after the incident.

The medical evidence, and the opinions of Mr. Hernandez's doctors, fail to connect his medical conditions to the use of the handcuffs. Because of the absence of medical or physical evidence establishing that Mr. Hernandez suffered an injury as a result of the handcuffs, there is no genuine issue of material fact which would prevent the grant of summary judgment. *See Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 402–03 (6th Cir. 2009) (allegations of bruising and wrist marks create a genuine issue of material fact); *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002) ("Our precedents allow the plaintiff to get to a jury upon a showing that

officers handcuffed the plaintiff excessively and unnecessarily tightly and ignored the plaintiff's pleas that the handcuffs were too tight."); *Baskin v. Smith*, 50 F. App'x 731, 737–38 (6th Cir. 2002) (denying qualified immunity on summary judgment for excessive force when plaintiff alleged handcuffing for forty-five minutes to an hour caused pain and pinched his wrists until they bled); *Grooms v. Dockter*, No. 95–1261, 1996 WL 26917, at *1–2 (6th Cir. Jan. 23, 1996) (affirming denial of summary judgment to defendant police officers because they left a suspect handcuffed too tightly for thirty minutes, resulting in serious damage to his hands and wrists, including swelling and bruising).

The Sixth Circuit has found that the absence of medical records or the fact that a plaintiff failed to seek medical treatment for the claimed injury is significant. *James v. Tunnell*, 481 F. App'x 997, 997–98 (6th Cir. 2012); *Miller v. Sanilac Cnty.*, 606 F.3d 240, 252 (6th Cir. 2010). As Mr. Hernandez has failed to support his allegations that he was injured as a result of being placed in handcuffs, under *Miller* and *James*, the Court concludes that Officers Greeno, McMonigal, and Schmidt did not violate Mr. Hernandez's Fourth Amendment rights.

*C. Failure to Intervene*

Mr. Hernandez's failure to intervene claim also fails. Officers who do not themselves exert excessive force may be liable for failure to prevent the use of excessive force by another. The liability is based upon whether the officers had the opportunity and ability to prevent the abuse. An officer must have observed or had reason to know that excessive force would be or was being used, and had both the opportunity and means to prevent the harm. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). These defendants must have done "more than play a passive role in

the alleged violation or showed mere tacit approval of the goings on." *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999).

As the court has previously found, Mr. Hernandez was not subjected to unreasonable force. Therefore, under *Turner* and *Bass*, Mr. Hernandez has failed to establish a failure to intervene claim.

### D. Claims Against Defendants Greg Horne and the City of Findlay, Ohio

In response to Defendants' motion for summary judgment, Mr. Hernandez concedes his claims against Police Chief Horne and the City of Findlay. (Doc. No. 61, p. 23). Therefore, summary judgment is granted to Police Chief Horne and the City of Findlay.

### E. State Law Claims

Under 28 U.S.C. § 1367(c)(3), this Court may decline to exercise supplemental jurisdiction over state law claims if this Court "has dismissed all claims over which it has original jurisdiction . . . ." Because the Court has dismissed Mr. Hernandez's federal claims, the Court declines to exercise jurisdiction over Mr. Hernandez's state law claims of gross negligence (Count II) and civil liability for criminal conduct under Ohio Rev. Code § 2307.60 (Count III). *See* 28 U.S.C. § 1367(c)(3); *see also Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996). Mr. Hernandez's state law claims are dismissed without prejudice.

## V. Conclusion

Accordingly, Mr. Hernandez's allegations against Police Chief Horne and the City of Findlay are dismissed pursuant to Rule 56(a). The motion for summary judgment filed by Officers Greeno, McMonigal, and Schmidt is granted as to Mr. Hernandez's federal claims. Mr.

Hernandez's state law claims as to Officers Greeno, McMonigal, and Schmidt are dismissed without prejudice.

       IT IS SO ORDERED.

                                                                                    S/ *David A. Katz*
                                                                                     DAVID A. KATZ
                                                                                     U. S. DISTRICT JUDGE